# SEALED

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

Civ. Case No. _____

FILED BY _KP_ D.C.

MAR 0 3 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

FEDERAL TRADE COMMISSION,

Plaintiff,

v.

CLICK PROFIT, LLC, a Florida limited
liability company, also doing business as
FBALaunch, PortfolioLaunch, Elevated
Ventures, and Automation Industries,

SA AUTOMATION ENTERPRISE LLC, a
Delaware limited liability company, also doing
business as Click Profit, FBALaunch, and
PortfolioLaunch,

M23 HOLDINGS, LLC, a Delaware limited
liability company, also doing business as Click
Profit, FBALaunch, and PortfolioLaunch,

CLICK PROFIT DISTRIBUTION, LLC, a
Delaware limited liability company, also doing
business as Click Profit, FBALaunch,
PortfolioLaunch, and Automation Industries,

AUTOMATION INDUSTRIES LLC, a Florida
limited liability company, also doing business
as Click Profit, FBALaunch, and
PortfolioLaunch,

M7 INVESTMENTS LLC, a Massachusetts
limited liability company, also doing business
as Click Profit, FBALaunch, and
PortfolioLaunch,

EXPRESS ECOM LLC, a Delaware limited
liability company, also doing business as Click
Profit, FBALaunch, and PortfolioLaunch,

**FILED UNDER SEAL**

FILED
IN CLERKS OFFICE
U.S. DISTRICT COURT
DISTRICT OF MASS.
2025 MAR 13 PM 2: 56

ECOM DIRECT LLC, a Wyoming limited
liability company, also doing business as Click
Profit, FBALaunch, and PortfolioLaunch,

CRAIG EMSLIE, individually and as an
officer, director, or owner of CLICK PROFIT,
LLC, SA AUTOMATION ENTERPRISE
LLC, and EXPRESS ECOM LLC,

PATRICK MCGEOGHEAN, individually and
as an officer, director, or owner of CLICK
PROFIT, LLC, M23 HOLDINGS, LLC and
M7 INVESTMENTS LLC,

JASON MASRI, individually and as an officer,
director, or owner of AUTOMATION
INDUSTRIES LLC and CLICK PROFIT
DISTRIBUTION, LLC, and

WILLIAM HOLTON, individually and as an
officer, director, or owner of CLICK PROFIT,
LLC, EXPRESS ECOM LLC, and ECOM
DIRECT LLC,

Defendants.

## PLAINTIFF'S COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges:

1.     The FTC brings this action for Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a); the FTC's Trade Regulation Rule entitled "Disclosure Requirements and Prohibitions Concerning Business Opportunities" ("Business Opportunity Rule"), 16 C.F.R. pt. 437; the Consumer Review Fairness Act ("CRFA"), 15 U.S.C. § 45b; and the FTC's Trade Regulation Rule entitled "Impersonation of Government and Businesses" ("Impersonation Rule"), 16 C.F.R. pt. 461. For these violations, the FTC seeks relief, including a temporary, preliminary, and permanent injunction; monetary relief; and other relief, including an asset

2

freeze, appointment of a receiver, and immediate access to Defendants' business premises,

pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b; the Business

Opportunity Rule; the CRFA; and the Impersonation Rule.

## SUMMARY OF THE CASE

2.      Defendants operate a business opportunity scheme called "Click Profit" that

promises to make consumers owners of fully operational, technologically sophisticated

e-commerce stores, but in fact bilks them out of tens of thousands of dollars.

3.      Using false promises about how much consumers can earn, Defendants market

their scheme as a lucrative, risk-free generator of "passive income" that is powered by artificial

intelligence ("AI") and affiliated with well-known brands such as Nike and Disney. Defendants

promise to "build you a massively profitable e-commerce store from the ground up" for

consumers that will make "a ton of money" by selling products on Amazon, Walmart, and

TikTok. In reality, the highly touted AI technology and brand partnerships do not exist, and the

promised earnings never materialize.

4.      Moreover, Defendants routinely fail to disclose required information—such as

substantiation for any claims about earnings, past litigation history, and contact information for

prior business opportunity purchasers—to consumers before they invest. As a result of these

tactics, consumers lose most, if not all, of their payments, which typically exceed $50,000. In

total, Defendants' scheme has defrauded consumers of at least millions of dollars.

5.      To hide their misconduct, Defendants also include non-disparagement clauses in

their contracts with consumers and suppress negative reviews by threatening to sue consumers

who post them or conditioning refunds on the removal of such reviews.

3

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

7.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(1), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

8.    The FTC is an independent agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Business Opportunity Rule, 16 C.F.R. pt. 437, which requires sellers to provide disclosure documents and prohibits false or unsubstantiated earnings claims; the CRFA, 15 U.S.C. § 45b, which prohibits standardized contract provisions that threaten or penalize people for posting honest reviews; and the Impersonation Rule, 16 C.F.R. pt. 461, which prohibits misrepresenting affiliation with, or endorsement or sponsorship by, a government entity or business.

## DEFENDANTS

### Corporate Defendants

9.    Defendant Click Profit, LLC, doing business as FBALaunch, PortfolioLaunch, Elevated Ventures, and Automation Industries, is a Florida limited liability company with its principal places of business at 333 SE 2nd Avenue, Miami, Florida and 1800 N. Bayshore Drive, Miami, Florida. At all times relevant to this Complaint, acting alone or in concert with others, Click Profit, LLC has advertised, marketed, distributed, or sold e-commerce business

4

Case 1:25-mc-91105-JEK    Document 2-1    Filed 03/13/25    Page 5 of 39
Case 1:25-cv-20973-JB *SEALED*   Document 1   Entered on FLSD Docket 03/03/2025   Page 5
of 39

opportunities and management services to consumers throughout the United States. Click Profit,
LLC transacts or has transacted business in this District and throughout the United States.

10.     Defendant SA Automation Enterprise LLC, doing business as Click Profit,
FBALaunch, and PortfolioLaunch, is a Delaware limited liability company with its principal
places of business at 444 99th Street Ocean, Marathon, Florida and 3500 S. Dupont Highway,
Dover, Delaware. At all times relevant to this Complaint, acting alone or in concert with others,
SA Automation Enterprise has advertised, marketed, distributed, or sold e-commerce business
opportunities and management services to consumers throughout the United States. SA
Automation Enterprise transacts or has transacted business in this District and throughout the
United States.

11.     Defendant M23 Holdings, LLC, doing business as Click Profit, FBALaunch, and
PortfolioLaunch, is a Delaware limited liability company with its principal places of business at
174 Ridge Street, Winchester, Massachusetts and 3500 S. Dupont Highway, Dover, Delaware.
At all times relevant to this Complaint, acting alone or in concert with others, M23 Holdings has
advertised, marketed, distributed, or sold e-commerce business opportunities and management
services to consumers throughout the United States. M23 Holdings transacts or has transacted
business in this District and throughout the United States.

12.     Defendant Click Profit Distribution, LLC, doing business as Click Profit,
FBALaunch, PortfolioLaunch, and Automation Industries, is a Delaware limited liability
company with its principal places of business at 3500 S. Dupont Highway, Dover, Delaware and
10493 Jane Eyre Drive, Orlando, Florida. At all times relevant to this Complaint, acting alone or
in concert with others, Click Profit Distribution has advertised, marketed, distributed, or sold e-
commerce business opportunities and management services to consumers throughout the United

States. Click Profit Distribution transacts or has transacted business in this District and throughout the United States.

13.     Defendant Automation Industries LLC, doing business as Click Profit, FBALaunch, and PortfolioLaunch, is a Florida limited liability company with its principal places of business at 7901 4th Street N Suite 16603, St. Petersburg, Florida and 10493 Jane Eyre Drive, Orlando, Florida. At all times relevant to this Complaint, acting alone or in concert with others, Automation Industries has advertised, marketed, distributed, or sold e-commerce business opportunities and management services to consumers throughout the United States. Automation Industries transacts or has transacted business in this District and throughout the United States.

14.     Defendant M7 Investments LLC, doing business as Click Profit, FBALaunch, and PortfolioLaunch, is a Massachusetts limited liability company with its principal place of business at 174 Ridge Street, Winchester, Massachusetts. At all times relevant to this Complaint, acting alone or in concert with others, M7 Investments has advertised, marketed, distributed, or sold e-commerce business opportunities and management services to consumers throughout the United States. M7 Investments transacts or has transacted business in this District and throughout the United States.

15.     Defendant Express Ecom LLC, doing business as Click Profit, FBALaunch, and PortfolioLaunch, is a Delaware limited liability company with its principal places of business at 8 The Green, Dover, Delaware and 11520 Windham Parkman Road, Garrettsville, Ohio 44231. At all times relevant to this Complaint, acting alone or in concert with others, Express Ecom has advertised, marketed, distributed, or sold e-commerce business opportunities and management services to consumers throughout the United States. Express Ecom transacts or has transacted business in this District and throughout the United States.

16.     Defendant Ecom Direct LLC, doing business as Click Profit, FBALaunch, and PortfolioLaunch, is a Wyoming limited liability company with its principal places of business at 411 N. Abbe Road, Elyria, Ohio, 11520 Windham Parkman Road, Garrettsville, Ohio, and 830 Taylor Street, Elyria, Ohio. At all times relevant to this Complaint, acting alone or in concert with others, Ecom Direct has advertised, marketed, distributed, or sold e-commerce business opportunities and management services to consumers throughout the United States. Ecom Direct's address at 830 Taylor Street has been used by each one of the Defendants as a business location and warehouse. Ecom Direct transacts or has transacted business in this District and throughout the United States.

### Individual Defendants

17.     Defendant Craig Emslie is an owner, officer, manager, director, or member of Click Profit, LLC, SA Automation Enterprise LLC, and Express Ecom LLC. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Emslie is the face of Click Profit and its co-founder. He uses false and unsubstantiated claims to pitch Click Profit in emails, video advertisements, recorded interviews with purported endorsers, and communications with prospective purchasers. Emslie has also negotiated settlements with consumers about refunds as well as hired an attorney to threaten litigation against consumers who post negative reviews. Emslie is a signatory on bank accounts for Click Profit, LLC as well as payment processing accounts used by the Corporate Defendants to accept funds from consumers. Emslie resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

7

18.     Defendant Patrick McGeoghean is an owner, officer, manager, director, or member of Click Profit, LLC, M23 Holdings, LLC and M7 Investments LLC. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. McGeoghean is the co-founder of Click Profit and manages many of the company's operations. For example, McGeoghean is a signatory on bank accounts and payment processing accounts used by the Corporate Defendants to receive funds from consumers; he has registered domain names used by Defendants to promote their scheme, including www.clickprofit.io; he has created marketing materials with deceptive claims that Defendants give to prospective purchasers; and he has procured telephone numbers used by Defendants to communicate with current and prospective purchasers. In connection with the matters alleged herein, McGeoghean transacts or has transacted business in this District and throughout the United States.

19.     Defendant Jason Masri is an owner, officer, director, or member of Automation Industries LLC and Click Profit Distribution, LLC. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. For example, Masri serves as Defendants' operations manager and oversees the day-to-day tasks of running Click Profit's e-commerce stores; he is a signatory on bank accounts used by the Corporate Defendants to accept funds from consumers; he is identified as the contact for consumer questions about earnings on the Click Profit website; and he has made false earnings claims to consumers. In connection with the matters alleged herein, Masri transacts or has transacted business in this District and throughout the United States.

8

Case 1:25-mc-91105-JEK   Document 2-1   Filed 03/13/25   Page 9 of 39
Case 1:25-cv-20973-JB *SEALED*   Document 1   Entered on FLSD Docket 03/03/2025   Page 9
of 39

20.     Defendant William Holton is an owner, officer, manager, director, or member of
Click Profit, LLC, Express Ecom LLC, and Ecom Direct LLC. At all times relevant to this
Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the
authority to control, or participated in the acts and practices set forth in this Complaint. For
example, Holton is a co-founder of Click Profit; he is a signatory on bank accounts used by the
Corporate Defendants to accept funds from consumers; and he opens and manages Click Profit's
e-commerce stores. In connection with the matters alleged herein, Holton transacts or has
transacted business in this District and throughout the United States.

## COMMON ENTERRISE

21.     Defendants Click Profit, LLC, SA Automation Enterprise LLC, M23 Holdings,
LLC, Automation Industries LLC, Click Profit Distribution, LLC, M7 Investments LLC, Express
Ecom LLC, and Ecom Direct LLC (collectively, "Corporate Defendants"), have operated as a
common enterprise while engaging in the deceptive and unfair acts and practices and other
violations of law alleged below. The Corporate Defendants have conducted the business
practices described below through an interrelated network of companies that have common
ownership, business functions, employees, office locations, and mailing addresses, and that have
commingled funds. For instance, the Corporate Defendants are all owned and operated by one or
more of the Individual Defendants. The Corporate Defendants use the same websites to operate
the Click Profit business, share office addresses, operate from the same warehouse to store
inventory and company documents, and routinely transfer thousands of dollars amongst their
corporate bank accounts. Because the Corporate Defendants have operated as a common
enterprise, each of them is liable for the acts and practices alleged below.

9

## COMMERCE

22.    At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

### *The Click Profit Business Opportunity Scheme*

23.    Since at least 2021, Defendants have deceptively advertised, marketed, distributed, promoted, and sold business opportunities to consumers throughout the United States. Defendants refer to their scheme interchangeably as "Click Profit," "FBALaunch," "PortfolioLaunch," or "Automation Industries" (collectively, "Click Profit").

24.    Defendants pitch Click Profit as an e-commerce business that is "safe, secure, and proven to generate wealth." In exchange for initial payments of at least $45,000, Defendants claim that they will set up e-commerce stores with Amazon, Walmart, and TikTok; manage all logistics associated with running these stores, including product selection, shipping, and customer service; and split a percentage of profits generated by the stores with consumers. Defendants assure consumers that these profits will outperform returns on traditional investments, like stocks and real estate, and be both "consistent" and "predictable."

25.    In their advertisements, marketing materials, and sales pitches, Defendants hold themselves out as e-commerce experts with years of specialized experience, a successful record of helping hundreds of consumers run profitable e-commerce businesses, and dozens of employees, including "client success managers," developers, data analysts, and researchers.

10

26.     Few of Click Profit's customers see a return on their investments, much less the promised amounts. In fact, most consumers lose their entire payments, and some are saddled with burdensome credit card debt and unsold products.

### Click Profit's Deceptive Advertisements, Websites, and Promotional Materials

27.     Consumers typically first encounter Click Profit when they see Defendants' advertisements on search engines, social media, and third-party websites such as BizBuySell.com. These ads use deceptive claims to lure consumers to Click Profit's websites, including www.clickprofit.io and www.fbalaunch.co, which themselves contain additional misleading statements. The websites invite consumers to "apply" for an opportunity to invest in Click Profit by answering a handful of screening questions and submitting their contact information. Consumers then receive sales calls, during which Defendants tout their purported ability to generate substantial, risk-free returns for consumers, and then pressure consumers to pay to enroll.

28.     In their advertisements, marketing materials, and sales pitches, Defendants rely on three key claims to entice prospective purchasers—that: (1) Click Profit consumers will earn substantial income; (2) Defendants have negotiated partnerships or are affiliated with name-brand companies such as Nike and Disney, enabling Click Profit to buy popular products in bulk at low prices so consumers can resell them at high margins in their stores; and (3) Defendants employ proprietary technology, consisting of advanced machine learning and AI, to select the products for the stores that they manage, thereby ensuring demand and profitability. All of these claims are false.

*Deceptive Earnings Claims*

29.     Defendants' social media advertisements and search engine ads promote Click

Profit as a "Fully Automated Turn-Key Ecom Brand" that will enable consumers to generate

"insane returns" in the form of tens to hundreds of thousands of dollars in sales per month. For

example, in Google search engine ads shown below, Defendants promise that consumers will

generate $150,000 in sales "guaranteed" and earnings of "6, 7 & 8, figs (with 100% guarantee)."

**Figure 1 – Click Profit Google Ads (2024)**

---

**Sponsored**

 Click Profit LLC
apply.clickprofit.io/

## Click Profit

Own a ecom portfolio and generate up to $150k in sales
guaranteed.

---

**Sponsored**

 fbalaunch.clickprofit.io
fbalaunch.clickprofit.io/

## FBALaunch AMZ Automation

Learn how we build, manage and scale amz FBA stores
to 6, 7 & 8 figs (with 100% guarantee)

---

30.     Defendants also advertise on third-party websites such as BizBuySell.com. One

of Defendants' advertisements on that page contained a brochure available for download that

highlighted "testimonials" from consumers who have supposedly earned tens or hundreds of

thousands of dollars in sales in short time periods, including the below examples of one Amazon

store that earned over $100,000 in sales in 7 days and another that earned over $380,000 in sales

in 30 days.

**Figure 2 – Sample Amazon Store Sales from Click Profit "Wholesale Automation Amazon FBA" Brochure (2024)**



31.      Defendant Craig Emslie, who is the co-founder and CEO of Click Profit, appears in many of the company's advertisements, marketing materials, and sales pitches. He personally makes many of the earnings claims, emphasizing the high returns by fanning himself with wads of cash and highlighting consumers' purported returns in the range of several hundred thousand dollars. For example, in the TikTok videos below, he appears alongside Warren Buffet and presents a consumer's Amazon store he claims made over $100,000 in seven days.

**Figure 3 – Click Profit TikTok Ads (2024)**






32.     In Defendants' advertisements, marketing materials, and sales pitches, Emslie also emphasizes Click Profit's superiority to other investments, promises high profit margins, and otherwise hypes large returns, including in the statements below:

- "Turn Amazon into your personal gold mine."
- Click Profit purchasers will "reap insane returns month over month that far exceed anything you would see in the stock market or real estate."
- "Everyday people just like you and I can make a ton of money."
- "[S]ee a 19% estimated return in just 60 days and that's me being extremely conservative."
- "[W]e've averaged about $5 to $6 million a month in sales on our company store just in the last four years alone, meaning we did close to a quarter billion – with a B – in sales on just our own stores over the last decade."

33.     Defendant Patrick McGeoghean, another co-founder of Click Profit, echoes these earnings claims. In a presentation he made to consumers, he displays customer sales as high as $13 million a year, and claims consumers can "get a 100% handsfree passive income," "We Can Guarantee It," and "We want the ROI [return on investment] at or around ~30%!"

34.     Defendants' misleading search engine and social media ads contain links that direct consumers to various Click Profit websites, which repeat the false claims in the ads. For example, one of Click Profit's websites, www.clickprofit.io, showcases purported consumers who have made tens or thousands of dollars in sales, including the below examples showing one Amazon store with product sales of over $540,000 one month and another Amazon store with over $60,000 in product sales over the prior 30 days.

**Figure 4 – Sample Amazon Store Sales from Clickprofit.io Website (2024)**



35.     Click Profit's website also features several consumer testimonial videos, which

are conversations with Defendant Emslie, along with written narratives describing these

purported "success stories," including:

- **"Angie"** – Purportedly earned $28,332 in net profit from $165,195 in sales during a one-month period.

- **"Sean Burston"** – "After joining our program, Sean found it easy to sell things online . . . . As of 2023, the ROI on his store is sitting at aprox [sic] 45%." Sean purportedly earned $15,857 in profit from $85,398 in sales during a one-month period.

- **"Luke Lechner"** – "Luke has many other businesses, but he thinks FBALaunch is the best one of them all." Luke purportedly earned $53,971 in profit from $245,326 in sales during an unspecified time frame.

- **"Jake Cox"** – Jake "produced multiple 6 figures in revenue" and "made a staggering amount of profit." As a result, "Jake was talking to [Defendants] and other big companies about selling his store for a lot of money, maybe even a million dollars or more."

- **"Ronnie"** – "In just three weeks from launch, Ronnie's store showcased exceptional performance, far surpassing initial sales expectations with a staggering ROI," purportedly earning over $11,000 in profit from $40,000 in revenue in its first two months.

16

36.     Another Click Profit website, www.fbaluanch.co, claims an average profit of

$142,833 earned from $446,509 in revenue per year. Defendants emphasize these figures "are

just the **AVERAGES**," meaning that "half our FBA Launch clients did **BETTER**."

37.     This same website also touts the success of three purported consumers and

encourages: "Don't Take Our Word On It, Believe Our Clients." As shown below, these

individuals include "Jacob O.," who purportedly earned $266,248 in profit from $918,935 in

sales; "Jake C.," who purportedly earned $879,573 in profit from $2,837,334 in sales; and

"James G.," who purportedly earned $451,836 in profit from $1,328,931 in sales.

**Figure 5 – FBALaunch.co Website (2024)**



38.     Click Profit's websites contain forms where consumers can submit their contact

information to learn more about the business opportunity, ask a question, speak with a sales

representative, or "apply" to participate in the business. After completing these forms, consumers

receive brochures, slide decks, and other promotional emails from Defendants that repeat the earnings claims.

39.     For example, one brochure Defendants email to prospective purchasers contains a "results" section with Amazon and Walmart sales screenshots similar to those displayed on Click Profit's websites. Some of these screenshots show consumers supposedly generating hundreds of thousands to millions of dollars yearly, including the below stores that purportedly earned \$4.03 million, \$1.77 million, and \$714,700 in annual sales.

**Figure 6 – Sample Walmart Store Sales from Click Profit "Revolutionizing Ecommerce Investments" Brochure (2024)**





40.     Defendants email consumers other promotional materials that "guarantee" "100% handsfree passive income" and show stores making millions in annual sales, like the slide deck below:

18



**Figure 7 – Sample Store Sales from Click Profit Email Slideshow (2023)**



41.     Defendants also claim that their business opportunity is risk-free because of their money-back guarantee, which promises around $100,000 or $150,000 in sales. As Defendant Emslie put it in one of Click Profit's social media ads: "We'll do $100,000 in sales in 52 weeks or less – one year – or you get every single penny of your investment back." The guarantee is featured in many of Click Profit's advertisements and on its websites, including the example below highlighting the company's "unique approach" that is "***backed with a $150k sales guarantee***."

**Figure 8 – Clickprofit.io Website (2024)**



42.     To bolster their claims that consumers will earn substantial income, Defendants tout other guarantees, including that they will buy back any unsold merchandise from consumers' stores. In their marketing materials and advertisements, Defendant Emslie has represented that these guarantees ensure "a ZERO% chance you lose money" and will provide Click Profit's customers with "legal protection." Emslie also frequently highlights these guarantees in promotional videos on Defendants' websites, claiming, for example that it is a "no questions asked" money-back guarantee. By comparison, Emslie boasts, the "stock market, real estate, or precious metals will never be able to offer you that level of security."

43.     In addition to the sizable and consistent monthly earnings Defendants promise, they also tease the prospect of a venture capital "buy out." Specifically, Defendants claim to have a "network of VC [venture capital] firms" to "help you exit your store for a **3-6x multiple**" and cite one example of a consumer who purportedly sold his store for $1.25 million (see Figure 5, above).

44.     Defendants tout throughout their marketing materials that Click Profit is life-changing—that consumers can make so much "passive income" while doing nothing, or while they simply sleep, that they can quit their day jobs. In one video testimonial on Click Profit's website, a purported customer boasted, "next thing you know, I'm going to start slowly stepping back from my day-to-day job," and that he would have "less stress during the day" and "less physical work," so he could spend more time with his family. Another purported customer said that he could "replace [his wife's] income and retire her" in less than two years, and retire himself in five years. Yet another expressed relief that Click Profit provided "freedom" to "go about your day and not have to worry so much about your money," and that it "free[d] up more time for other things."

45.     In their earnings claims made through the general media, including the examples above, Defendants fail to include information required by the Business Opportunity Rule, including the beginning and ending dates when the represented earnings were achieved, and the number and percentage of all persons who purchased Click Profit's business opportunity prior to that ending date who achieved at least the stated level of earnings.

46.     In reality, the majority of consumers do not earn anywhere close to the substantial income promised by Defendants, and instead lose money. Despite claiming to manage stores on multiple platforms, nearly all of Click Profit's stores are on Amazon. According to Amazon, as of mid-2024, around 14% of Click Profit's 230 stores earned no sales at all, around a third earned less than $5,000, and the median store earned around $14,000—and those are *gross lifetime* sales. After deducting Amazon's fees, those numbers drop—around 21% of stores earn nothing, around a third earn less than $2,500, and the median store earns only about $7,200 during its entire lifetime.

21

Case 1:25-mc-91105-JEK   Document 2-1   Filed 03/13/25   Page 22 of 39
Case 1:25-cv-20973-JB *SEALED*   Document 1   Entered on FLSD Docket 03/03/2025   Page 22
of 39

47.     Consumers take home a fraction of those net sales. Click Profit takes an additional
fee of at least $3 per shipment to an end customer, and then a "profit split" of around 25%-35%.
After those deductions, the meagre "profits" earned by consumers come nowhere close to
recouping their payments, which include Click Profit's initial management fee of at least
$45,000, along with payments to purchase inventory—typically several thousands of dollars
several times a year. As a result, in most cases, the costs for Defendants' services and inventory
exceed the amount Click Profit consumers realize from their stores. And while Defendants claim
an average yearly sales revenue of $446,509.56, not a single store earned nearly that much
revenue during its entire lifetime—much less per year.

48.     Click Profit does not deliver the income it promises will allow consumers to retire
or permanently replace their day jobs—indeed, the average store makes sales for only about 6.7
months.

*Deceptive Affiliation and AI Claims*

49.     In their advertisements, marketing materials, and sales pitches, Defendants claim
to have negotiated partnerships with name-brand companies, thereby enabling Click Profit to
purchase so-called "tier 1" merchandise in bulk quantities at a discounted price and then resell
this merchandise in consumers' stores at high margins. Assuring consumers they "ONLY sell
name brand products," Defendants promote these purported deals as one of the keys to why
Click Profit consistently outperforms competitors in generating lucrative returns for consumers.

50.     Many of Click Profit's brand affiliation claims are made by Defendant Emslie
himself in promotional videos featured on websites and social media ads. These claims include:

- Click Profit has "exclusive wholesale licenses" giving Defendants "the ability
  to go out and purchase massive quantities of name brand products . . . at a
  discount with exclusive wholesale rights."

22

- Click Profit consumers "were making a killing" during the pandemic "because of our partnership with 3M."

- "We've partnered with top brands, like Colgate, 3M, Dove, Yeti, and many more," and "we have the rights to resell these highly trusted and liked products on any and all marketplaces."

- "We've partnered with some of the very best and biggest big box manufacturers so you get access to tier 1 inventory with lightning fast inventory flips and incredible margins."

According to Emslie, these brand affiliation deals required "almost a decade" to build and negotiate.

51.    In one of Defendants' promotional emails, Defendant McGeoghean has also told consumers that "You get to piggy back off our **established wholesale relationships**" to "increase your **overall profit margin** and in turn increase your **ROI**."

52.    Similarly, the names and logos of major brands are often prominently featured on Defendants' websites, like the example below.

**Figure 9 – Clickprofit.io Website (2024)**



53.    Another "competitive advantage" promoted by Defendants is their purported use of proprietary AI technology. According to Defendant McGeoghean, "We use our private software that leverages **AI** and **Machine Learning** technology so we can find the most profitable

23

products to put in your store." Defendants say that a team of sixteen developers spent over three years and nearly $5 million to build this "super computer," which has generated around $100 million in sales. According to one consumer, Defendants "relentlessly hyped" the prowess of this AI technology in sales pitches.

54.     In a social media ad, Defendant Emslie described this technology as an "AI-backed bot" that analyzes "over three and a half years of real-life e-commerce data" compiled by multiple "teams" consisting of "product researchers," "data analysts," "credit acquisitions," "supplier research," "product negotiation," and "supplier acquisition." He has also referred to it as "systematic data driven scaling."

55.     Because of this "proprietary" software, Defendants claim that their stores can quickly become distinguished among the millions of third-party stores on Amazon and other platforms. On their website, for example, they boast that their "advanced AI" will "pinpoint top-performing inventory tailored to your store" to "guarantee top ranking and visibility."

**Figure 10 – Clickprofit.io Website (2024)**



56.     Defendants' brand affiliation and AI claims are false. They do not have any affiliation with name-brand companies that enable Click Profit to obtain exclusive or favorable deals for products manufactured by these companies, let alone a partnership or "wholesale license." Nor do they appear to employ proprietary, advanced AI to select "top-performing" products.

24

Case 1:25-mc-91105-JEK    Document 2-1    Filed 03/13/25    Page 25 of 39
Case 1:25-cv-20973-JB *SEALED*  Document 1  Entered on FLSD Docket 03/03/2025   Page 25
of 39

57.    In fact, Defendants' products consist primarily of a seemingly random assortment
of generic and off-brand consumer goods, such as makeup applicators, drying racks, stuffed
animal "warmies," food storage bags, and paper clips.

### The Click Profit Sales Pitch

58.    After Defendants lure consumers into providing their personal information on
Click Profit's websites, a Click Profit sales representative contacts the consumers to make final,
personalized pitches to encourage them to officially sign up. These pitches consist of emails and
video calls with sales representatives, as well as recorded testimonials from both Defendant
Emslie and other purported customers. In these communications, Defendants frequently repeat
and expand on the earnings claims from their advertisements and marketing materials. For
example, a Click Profit salesperson claimed that Defendants' customers "are usually seeing
anywhere from 60 to 120 percent return on their cash." Defendants provided another prospective
purchaser with a video-recorded testimonial from someone who held himself out as a current
Click Profit customer. This individual claimed that he had become wealthy thanks to Defendants
and woke up every morning to find another $10,000 in his bank account.

59.    Click Profit sales representatives also present different "packages" that depend on
consumers' initial payments into the business opportunity. Consumers who pay higher upfront
fees are promised larger profit margins.

60.    Although the initial investment tiers have varied over time, an example of the
options includes: (1) a "bronze" package, which requires a $45,000 up front fee and includes a
profit split of 65/35 (i.e., 65% of net profits to the consumer and 35% to Defendants); (2) a
"silver" package, which requires a $60,000 fee and provides a 70/30 profit split; and (3) a "gold"
package, which requires a $75,000 fee an provides a 75/25 profit split.

61.     On top of the initial fee, Defendants also require consumers to pay for inventory. In one sales pitch, the Click Profit sales representative told a prospective consumer interested in the $45,000 "bronze" package that he would have to pay an additional $10,000 for inventory, for a total payment of $55,000. And consumers must continue making other ongoing payments that Defendants purport to use for purchasing inventory.

62.     At no point during the sales process does Click Profit provide prospective purchasers with information required by the Business Opportunity Rule, such as a disclosure document that includes Click Profit's ligation history, the contact information of all prior purchasers, its cancellation and refund policy, and an earnings claim statement that provides information about all purchasers who have achieved the stated earnings.

### Consumers Do Not Earn What Defendants Promise and Lose Their Money

63.     After speaking with the sales representative, many consumers sign a contract and pay their initial "investment" to Defendants. They then work with another Click Profit representative to open an e-commerce store with the applicable platform, typically Amazon. Defendants Holton, another co-founder of Click Profit, and Masri, who is Click Profit's "operations manager" and serves on the "leadership executive team" (alongside Emslie, McGeoghean, and Holton) manage the day-to-day operations of these stores, including by purchasing inventory, managing warehousing, and supervising other Click Profit employees. Defendants continue to assure consumers of the promised earnings—Masri, for example, has claimed consumers would make a 20% return within three months.

64.     Click Profit does not deliver on its promises. Click Profit never opens some consumers' stores at all. Many consumers discover that it takes several months for their stores to become operational.

26

65.     Even when Defendants do open a store, many are suspended or blocked by the selling platform because Click Profit has violated the platform's seller policies in some way. As of mid-2024, around 78% of Amazon stores associated with Click Profit were non-operational. In total, Amazon has blocked, suspended, or shut down around 95% of Click Profit's stores at some point due to some misconduct by Defendants.

66.     For the stores that remain operational, consumers typically find that the revenue generated from these stores does not come close to the amount promised by Defendants in their earnings claims, much less turn a profit. Moreover, if stores do begin producing revenue, Defendants often require consumers to invest these funds back into the Click Profit business opportunity, purportedly to pay for new inventory. In one instance, for example, Defendants threatened to shut down a store if the consumer refused to pay back to Click Profit the entirety of his profit split.

67.     Many consumers gradually realize that Click Profit will not be able to deliver on its multiple guarantees, including the promised earnings, and have complained directly to Click Profit or to third-parties like the Better Business Bureau ("BBB") that Defendants, including Emslie and Masri specifically, have defrauded them. Consumers also try to terminate their relationship with Click Profit and demand their money back. Defendants become markedly less responsive after obtaining consumers' initial payments, often ignoring questions, concerns, and complaints. Click Profit representatives often do not return phone calls, voicemails, and text messages. They also offer a litany of excuses for their lack of availability and Defendants' failure to deliver on their promised earnings. If consumers reach a representative, Click Profit generally refuses to refund consumers' payments.

27

68.      In other instances, consumers manage to obtain partial refunds or inventory returns, but only after filing complaints with third parties like the BBB, hiring an attorney, or raising the possibility of legal action against Defendants.

### *Defendants' Non-Disparagement Clauses and Suppression of Negative Reviews*

69.      Defendants go to great lengths to conceal their deceptive practices from consumers and law enforcement.

70.      When prospective consumers agree to invest in the Click Profit business opportunity, they are required to sign a nonnegotiable, standardized contract. Buried in the contract is a "non-disparagement" provision that prohibits consumers from leaving truthful, negative reviews. It mandates that "any issues or problems . . . shall be discussed . . . in a professional and private manner." It further prohibits consumers from sharing any "disparag[ing]" information about Click Profit "in any online or offline forum or any other forum whatsoever, including but not limited to social media channels . . . , regardless of whether such comments could be deemed factually true."

71.      In numerous instances, Defendants use this contract provision to threaten consumers with litigation after consumers have posted truthful negative reviews online or filed complaints with the BBB. As a result of Defendants' threats, some consumers have taken down their reviews. For example, after investing his life's savings in Click Profit and being summarily terminated as a client with nothing to show for his payments, one consumer posted truthful negative reviews online and filed a complaint with the BBB. An attorney hired by Defendant Emslie threatened to sue the consumer and take everything he and his wife owned, including their home and pensions. These threats terrified the consumer's wife, who cried herself to sleep for several nights. Concerned about losing even more money to Defendants, the consumer agreed

to have his online reviews taken down. As the consumer reported, after informing Defendants' attorney that he complied with this demand, he asked about receiving a partial refund. The attorney told the consumer that Emslie had responded, "F*** off."

72.    In other instances, such as when Defendants agree to provide a refund to a consumer who has filed a complaint with a third party or contemplated legal action, Defendants condition the refund on the consumer's removal of any negative online reviews and signing of a settlement agreement with similar prohibitions against discussing Click Profit truthfully with third parties.

73.    Defendants have also directly suppressed BBB complaints by repeatedly lying to the organization in response to its questions. For instance, Defendants have told the BBB that a consumer's complaint was fabricated by a "competitor who is slandering and attacking us online" and that Defendants have no association with the person who filed the report; that "we do not have a product or service that we offer that costs $45k"; and that "[w]e're a marketing and consulting firm and do not have operations based around products or selling products."

74.    Defendants' threats, intimidation, and gag clauses discourage consumers from cooperating with law enforcement and from sharing truthful, non-defamatory information about their experience with the Click Profit business opportunity scheme. These practices prevent other consumers from learning the truth about Defendants' operation before enrolling and make it easier for Defendants to continue their unlawful practices. These practices, which do not benefit consumers or competition, cause substantial harm to consumers that they cannot avoid in light of Defendants' lies and review suppression practices.

* * *

29

75.     Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission.

## VIOLATIONS OF THE FTC ACT

76.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

77.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

78.     Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

## COUNT I
### False or Unsubstantiated Earnings Claims

79.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of online services, Defendants represent, directly or indirectly, expressly or by implication, that consumers of Defendants' services are likely to earn substantial income.

80.     Defendants' representations as described above are false, misleading, or are not substantiated at the time the representations are made.

81.     Therefore, Defendants' representations as described above constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### COUNT II
#### Misrepresentations Regarding Brand Affiliation and Artificial Intelligence

82.    In numerous instances, in connection with the advertising, marketing, promotion,

offering for sale, or sale of online services, Defendants represent, directly or indirectly, expressly

or by implication, that:

> a.   Defendants are affiliated with major brands, such as Nike and Disney; and
>
> b.   Defendants use artificial intelligence to select profitable products to sell in
>      consumers' e-commerce stores.

83.    The representations set forth above are false or misleading.

84.    Therefore, Defendants' representations as set forth above constitute a deceptive

act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### COUNT III
#### Unfair Use of Non-Disparagement Clauses and Intimidation

85.    In numerous instances, Defendants have used tactics including threats,

intimidation, manipulation, and contract clauses to stop consumers from speaking or publishing

truthful and non-defamatory comments or reviews about Defendants and their services.

86.    Defendants' acts or practices cause or are likely to cause substantial injury to

consumers that consumers cannot reasonably avoid themselves and that is not outweighed by

countervailing benefits to consumers or competition.

87.    Therefore, Defendants' acts or practices as described above constitute unfair acts

or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

### VIOLATIONS OF THE BUSINESS OPPORTUNITY RULE

88.    The amended Business Opportunity Rule, 16 C.F.R. pt. 437, which was extended

in scope to cover certain work-at-home opportunities, became effective on March 1, 2012, and

has since that date remained in full force and effect.

31

89.    Defendants are "sellers" who, as described above, have sold or offered to sell "business opportunities" as defined by the Business Opportunity Rule, 16 C.F.R. § 437.1(c) and (q). Under the Business Opportunity Rule, a "seller" is a person who offers for sale or sells a business opportunity. 16 C.F.R. § 437.1(q). Under the Rule, a "business opportunity" means a "commercial arrangement" in which a "seller solicits a prospective purchaser to enter into a new business"; the "prospective purchaser makes a required payment"; and the "seller, expressly or by implication, orally or in writing, represents that the seller or one or more designated persons will . . . [p]rovide outlets, accounts, or customers, including, but not limited to, Internet outlets, accounts, or customers, for the purchaser's goods or services[.]" 16 C.F.R. § 437.1(c).

90.    Among other things, the Business Opportunity Rule requires sellers to provide prospective purchasers with a disclosure document in the form of and using the language set forth in the Business Opportunity Rule and its Appendix A, and any required attachments. In the disclosure document, the seller must disclose to prospective purchasers five categories of information, including: basic identifying information about the seller, any earnings claims the seller makes, the seller's litigation history, any cancellation and refund policy the seller offers, and contact information of prior purchasers. 16 C.F.R. § 437.3(a)(1)–(5). Furthermore, this information must be disclosed at least seven (7) days before the prospective purchaser signs a contract or makes a payment. 16 C.F.R. § 437.2. The pre-sale disclosure of this information enables a prospective purchaser to contact prior purchasers and take other steps to assess the potential risks involved in the purchase of the business opportunity.

91.    Defendants, as described above, have made earnings claims in connection with the sale of their business opportunities, as defined by the Business Opportunity Rule, 16 C.F.R. § 437.1(f). Under the Business Opportunity Rule, an "earnings claim" means "any oral, written,

32

or visual representation to a prospective purchaser that conveys, expressly or by implication, a specific level or range of actual potential sales, or gross or net income or profits." 16 C.F.R. § 437.1(f).

92. The Business Opportunity Rule prohibits sellers from making earnings claims unless the seller: (1) has a reasonable basis for the claim at the time it is made; (2) has in its possession written materials to substantiate the claim at the time it is made; (3) furnishes an earnings claim statement to prospective purchasers in conjunction with the disclosure document, containing, among other things, information regarding the time frame captured by the earnings claim, the characteristics of the purchasers, and the number and percentage of all persons who purchased the business opportunity within the time frame who achieved at least the stated level of earnings; and (4) makes written substantiation of the earnings claim available to any prospective purchaser who requests it. 16 C.F.R. § 437.4(a).

93. Defendants have also made earnings claims in connection with the sale of their business opportunities in the general media, as defined by the Business Opportunity Rule, 16 C.F.R. § 437.1(h). Under the Business Opportunity Rule, "general media" means "any instrumentality through which a person may communicate with the public, including, but not limited to, television, radio, print, Internet, billboard, Web site, commercial bulk email, and mobile communications." 16 C.F.R. § 437.1(h).

94. The Business Opportunity Rule prohibits sellers from making earnings claims in the general media unless the seller has a reasonable basis for and written substantiation of any earnings claims and states in immediate conjunction with those claims the beginning and ending dates when the represented earnings were achieved, and the number and percentage of all

33

persons who purchased Defendants' business opportunity prior to that ending date who achieved at least the stated level of earnings. 16 C.F.R. § 437.4(b).

95.     The Business Opportunity Rule also prohibits sellers from misrepresenting the amount of sales, or gross or net income or profits a prospective purchaser may earn or that prior purchasers have earned. 16 C.F.R. § 437.6(d).

96.     Pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the Business Opportunity Rule constitutes an unfair or deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT IV
## Misrepresentations Regarding Income or Profits

97.     In numerous instances in connection with the offer for sale, sale, or promotion of business opportunities, Defendants misrepresent the number of sales, or amount of gross or net income or profits, a prospective purchaser may earn or that prior purchasers have earned.

98.     Therefore, Defendants' acts and practices, as described above, violate the Business Opportunity Rule, 16 C.F.R. § 437.6(d), and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT V
## Disclosure Document Violations

99.     In numerous instances in connection with the offer for sale, sale, or promotion of business opportunities, Defendants fail to furnish prospective purchasers with a disclosure document and any required attachments within the time period prescribed by the Business Opportunity Rule.

100.    Therefore, Defendants' acts and practices, as described above, violate the Business Opportunity Rule, 16 C.F.R. §§ 437.2 and 437.3(a), and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

34

## COUNT VI
### Earnings Claims to Prospective Purchasers

101.    In numerous instances in connection with the offer for sale, sale, or promotion of business opportunities, Defendants make earnings claims to prospective purchasers while, among other things: (1) lacking a reasonable basis for the earnings claim at the time it was made; (2) lacking written substantiation for the earnings claim at the time it was made; or (3) failing to provide an earnings claim statement to the prospective purchasers, as required by the Business Opportunity Rule.

102.    Therefore, Defendants' acts and practices, as described above, violate the Business Opportunity Rule, 16 C.F.R. § 437.4(a), and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT VII
### General Media Earnings Claims Violations

103.    In numerous instances in connection with the offer for sale, sale, or promotion of a business opportunity, Defendants make earnings claims in the general media while failing to state in immediate conjunction with those claims the beginning and ending dates when the represented earnings were achieved, and the number and percentage of all persons who purchased Defendants' business opportunity prior to that ending date who achieved at least the stated level of earnings.

104.    Therefore, Defendants' acts and practices, as described above, violate the Business Opportunity Rule, 16 C.F.R. § 437.4(b), and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

35

## VIOLATIONS OF THE CONSUMER REVIEW FAIRNESS ACT

105.    The Consumer Review Fairness Act defines "covered communication" as "a written, oral, or pictorial review, performance assessment of, or other similar analysis of, including by electronic means, the goods, services, or conduct of a person by an individual who is party to a form contract with respect to which such person is also a party." 15 U.S.C. § 45b(a)(2).

106.    The CRFA defines "form contract" to mean "a contract with standardized terms (i) used by a person in the course of selling or leasing the person's goods or services; and (ii) imposed on an individual without a meaningful opportunity for such individual to negotiate the standardized terms." 15 U.S.C. § 45b(a)(3).

107.    Subsection (b) of the CRFA renders void any provision of a form contract if such provision prohibits or restricts the ability of an individual who is a party to the form contract to engage in a covered communication. *See* 15 U.S.C. § 45b(b)(1).

108.    The CRFA prohibits any person from offering a form contract containing a provision described as void in subsection (b) of the CRFA. *See* 15 U.S.C. § 45b(c).

109.    Pursuant to the CRFA, a violation of subsection (c) of the CRFA is treated as a violation of a rule promulgated under the FTC Act regarding unfair or deceptive acts or practices, and the FTC may enforce the CRFA in the same manner, by the same means, and with the same jurisdiction, powers, and duties as it enforces the FTC Act. *See* 15 U.S.C. § 45b(d).

### COUNT VIII
### Violations of the CRFA

110.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of online services, Defendants offer form contracts containing

36

provisions that prohibit or restrict the ability of an individual who is a party to the form contract to engage in a covered communication.

111.    Therefore, Defendants' acts and practices, as described above, violate the CRFA, 15 U.S.C. § 45b(c), and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TRADE REGULATION RULE ON IMPERSONATION OF GOVERNMENT AND BUSINESSES

112.    The Impersonation Rule, promulgated by the FTC under Section 18 of the FTC Act, 15 U.S.C. § 57a, became effective on April 1, 2024, and remains in full force and effect. The Impersonation Rule is codified at 16 C.F.R. Part 461.

113.    Section 461.3(b) of the Impersonation Rule prohibits "materially misrepresent[ing], directly or by implication, affiliation with, including endorsement or sponsorship by, a business or officer thereof, in or affecting commerce as commerce is defined by the Federal Trade Commission Act (15 U.S.C. § 44)." 16 C.F.R. § 461.3(b).

114.    The Impersonation Rule defines "materially" to mean "likely to affect a person's choice of, or conduct regarding, goods or services." 16 C.F.R. § 461.1. The Impersonation Rule defines "business" to include "a corporation, partnership, association, or any other entity that provides goods or services, including not-for-profit entities." *Id.*

115.    Pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the Impersonation Rule constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT IX
### False Claims of Business Affiliation

116.    In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of online services, Defendants materially misrepresent, directly or by

37

implication, that they are affiliated with certain businesses, such as Nike and Disney.

117.  Therefore, Defendants' representations as set forth above violate Section 461.3(b) of the Impersonation Rule, 16 C.F.R. § 461.3(b), and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## CONSUMER INJURY

118.  Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the Business Opportunity Rule, the CRFA, and the Impersonation Rule. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, the FTC requests that the Court:

A.  Enter a permanent injunction to prevent future violations of the FTC Act, the Business Opportunity Rule, the CRFA, and the Impersonation Rule;

B.  Grant temporary and preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including temporary and preliminary injunctions, an order freezing assets, immediate access to Defendants' business premises, the appointment of a receiver, turnover of business records, and limited expedited discovery;

C.  Award monetary and other relief within the Court's power to grant; and

D.  Award any additional relief as the Court determines to be just and proper.

38

Dated: 03/03/2025

Respectfully submitted,

Lisa W. Bohl (Special Bar No. A5503281)
James Davis (Special Bar No. A5502004)
Federal Trade Commission
Midwest Region
230 S. Dearborn Street, Suite 3030
Chicago, IL 60604
(312) 960-5624
lbohl1@ftc.gov
jdavis@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION